IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

            Plaintiff,                           6:18-cr-00299-MC

      v.

                                     **OPINION AND ORDER**

DAVID GEORGE HOPKINS,

            Defendant.

_____

**MCSHANE, District Judge**

Defendant David George Hopkins moves to vacate or set aside his convictions and 200-month sentence under 28 U.S.C. § 2255. For the reasons stated below, Mr. Hopkins' Motion is DENIED.

## BACKGROUND

On February 13, 2019, a jury found Mr. Hopkins guilty of the following counts: (1) attempting to use a minor to produce visual depiction of sexually explicit conduct, (2) attempted coercion and enticement of a minor, (3) travel to engage in illicit sexual activity, and (4) transfer of obscene material to a minor. Def.'s Amend. Mot. 1, ECF No. 190.

Evidence at trial established that in 2012, Mr. Hopkins began an online chat with a user named "Ana"[1] (referred to herein as "Confidential Informant" or "CI") on Adult Friend Finder ("AFF"), a virtual chat platform. Gov't Resp. 2, ECF No. 192. During these conversations with the CI, Mr. Hopkins described having had sexual encounters with minors and expressed a

_____

[1] "Ana" is the alias used online by the confidential informant. Gov't Resp. 2 n.1.

continuing desire to have sex with minors. Gov't Resp. 1–2. The CI discontinued the chat with Mr. Hopkins and had no further conversation with him until 2017 when Mr. Hopkins initiated a chat with her, again on AFF. *Id*. at 2. When Mr. Hopkins mentioned having sex with minors again, the CI contacted the police. This ultimately led her to begin cooperating as a confidential informant for the FBI. *Id.* at 4.

Under FBI supervision, the CI continued chatting with Mr. Hopkins. *Id.* During these chats, the CI was instructed to connect Mr. Hopkins to an undercover FBI agent who posed on the internet as a mother named "Norma" and her 12-year-old daughter "Paula." *Id.* at 5. Believing that he was chatting with Norma and Paula, Mr. Hopkins sent explicit photos of himself and discussed his desire to engage in sexual acts with both the mother and the daughter. *Id*. Mr. Hopkins eventually booked plane tickets to Portland, Oregon to have sex with the purported minor. *Id.* at 6–7. The FBI intercepted Mr. Hopkins at the Portland International Airport and found that Mr. Hopkins possessed Viagra, size small lingerie, and a stuffed animal intended to be a birthday gift for the minor. *Id.* at 7.

On January 17, 2020, after a jury convicted Mr. Hopkins on all counts, this Court sentenced Mr. Hopkins to 200-months of imprisonment followed by a lifetime of supervised release. *Id.* at 10. Mr. Hopkins now challenges his convictions and sentence pursuant to 28 U.S.C. § 2255, arguing that he received ineffective assistance of trial counsel. Def.'s Amend. Mot. 3.

## **STANDARDS**

A prisoner serving a federal sentence "may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). An evidentiary hearing is required, "unless the motion and the files and records of the case conclusively show that the

prisoner is entitled to no relief." *Id.* § 2255(b). When there has been a "denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate." *Id.*

## DISCUSSION

To establish a claim of ineffective assistance of counsel, a defendant must show that (1) "counsel's performance was deficient," and (2) counsel's "deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, to establish deficient performance, a "defendant must show that counsel's representations fell below an objective standard of reasonableness." *Id.* at 687–88. However, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Second, a defendant can only establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Therefore, "unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687.

### I.    Ineffective assistance of trial counsel Marc Friedman, Thaddeus Betz, and Brian Boender.

Mr. Hopkins alleges seven ways that trial counsel[2] were ineffective: (1) by prohibiting Mr. Hopkins from testifying; (2) failing to present critical evidence; (3) failing to argue that Mr. Hopkins was incompetent; (4) failing to properly investigate potential past misconduct by

---

[2] In his Motion, Mr. Hopkins often makes allegations against trial counsel generally, without specifying a particular attorney. The Court uses the phrase "trial counsel" in those circumstances.

government witnesses; (5) failing to effectively cross examine the CI; (6) failing to present mitigating evidence at sentencing; and (7) the cumulative impact of his attorneys' errors. Def.'s Amend. Mot. *i*. As explained below, none of Mr. Hopkins' arguments rise to the standard of a valid ineffective assistance of counsel claim under *Strickland*.

## A. <u>Mr. Hopkins not testifying at trial.</u>

Mr. Hopkins claims that he made "continuous requests" to trial counsel Marc Friedman to testify at trial and that attorney Friedman prohibited him from taking the stand. Def.'s Amend. Mot. 5. A defendant's right to testify is "fundamental" and "may be relinquished only by the defendant, and the defendant's relinquishment of the right must be knowing and intentional." *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993). However, a court "can infer that a defendant has personally waived his right to testify when defense counsel elects not to call the defendant as a witness, and despite being present, the defendant takes no affirmative action to demonstrate his disagreement with his counsel's decision not to call him as a witness." *United States v. Gillenwater*, 717 F.3d 1070, 1080 (9th Cir. 2013); *see also United States v. Felgentraeger*, 152 F.3d 930 (9th Cir. 1998). Moreover, "if the defendant wants to testify, he can reject his attorney's tactical decision by insisting on testifying, speaking to the court, or discharging his lawyer." *Joelson*, 7 F.3d at 177. Therefore, "waiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so." *Id.*

In *Gillenwater*, the court found the defendant had not waived his right to testify where the defendant and his trial counsel both told the court that the defendant wished to testify. *Gillenwater*, 717 F.3d at 1080–81. Unlike the defendant in *Gillenwater*, nothing in the record suggests that Mr. Hopkins told this Court that he desired to testify at trial. Gov't Resp. 13–14.

Nor is there any evidence indicating that Mr. Hopkins attempted to fire his attorneys based on their alleged refusal to allow him to testify. Mr. Hopkins' silence throughout trial, as reflected in the record, creates a reasonable presumption of waiver.

Even so, Mr. Hopkins claims that attorney Friedman refused to put him on the stand, despite his insistence to testify, and that Mr. Friedman lied to the jury during opening statements by claiming that Mr. Hopkins would testify. Def.'s § 2255 Mot. 2, ECF No. 168. The Court finds these allegations meritless. Attorney Friedman denies that he prohibited Mr. Hopkins from testifying at trial, and instead claims that Mr. Hopkins decided not to testify based on advice from his legal team. Friedman Decl. Ex. A, at 2–3, ECF No. 192-1. This is corroborated by Mr. Hopkins' direct appeal, where Mr. Hopkins acknowledged that he "cho[se] not to testify" after this Court made an evidentiary ruling allowing the Government to use Mr. Hopkins' incriminating statements for impeachment purposes. *See* Appellant's Reply Br. 8, *United States v. Hopkins*, Case No. 20-30022 (9th Cir. 2021). Mr. Hopkins made it clear during his appeal that any failure to testify was prompted by his fear of unfavorable cross-examination, rather than attorney Friedman prohibiting him from taking the stand. *Id.*

Moreover, an examination of the trial transcript reveals that attorney Friedman never told the jury in opening statements whether Mr. Hopkins would or would not testify during trial. *See* Trial Tr. vol. 1, 122–33, ECF No. 135. The Court's finding directly contradicts Mr. Hopkins' assertion that the jury was told it would hear his testimony. Def.'s § 2255 Mot. 2. In light of the record's clear refutation of Mr. Hopkins' allegations, it is unlikely that Mr. Hopkins could produce any further evidence at an evidentiary hearing to substantiate his claims.[3]

---

[3] Mr. Hopkins claims that there are emails between him and trial counsel that would prove he wanted to testify but was prohibited by trial counsel. Def.'s Amend. Mot. 5 n.2. This Court

Even if Mr. Hopkins provided evidence that he did not waive his right to testify, it is unlikely that his omitted testimony prejudiced his case or would have otherwise produced a different result. Mr. Hopkins claims that he was prejudiced because he was in a unique position to testify about his subjective intent. Def.'s Amend. Mot. 6. To combat the Government's theory that Mr. Hopkins intended to have sex with a minor, Mr. Hopkins argues that his testimony would have convinced the jury that his chats were purely fantasy-based. *Id.* Mr. Hopkins also argues that his testimony would have aided his entrapment defense by proving that he was not predisposed to engaging in sexual activities with minors.[4] *Id.* Even so, if Mr. Hopkins took the stand, the Government would have been able to impeach him with remarkably prejudicial statements that he made to the FBI— evidence that the court had previously suppressed as substantive evidence. Gov't Resp. 15. These included statements by Mr. Hopkins that he *knew* Paula, that he came to Portland to visit the minor and her mom, and that he bought Paula a stuffed animal for her birthday.[5] Gov't Br. 18–19, *United States v. Hopkins*, Case No. 20-30022 (9th Cir. 2021). Mr. Hopkins even admitted that the possibility of that evidence coming in

---

granted the Government's motion for an attorney-client privilege waiver and to compel evidence from trial counsel. Order, ECF No. 173. Mr. Hopkins "reserve[d] the right to supplement this filing" if he found documents corroborating his claims. Def.'s Amend. Mot. 5 n.2. Mr. Hopkins has not produced any emails to date.

[4] To disprove Mr. Hopkins' entrapment defense, the Government had the burden to show that Mr. Hopkins was predisposed to seeking and engaging in sex with minors, as opposed to being induced into these illegal activities by law enforcement. Def.'s Amend. Mot. 6.

[5] Prior to trial, Mr. Hopkins moved to suppress the statements he made to FBI agents while detained at the Portland International Airport, on the grounds that the agents failed to properly read his *Miranda* rights. Def.'s Mot. to Sup. 16, ECF 48. At a hearing on January 11, 2019, this Court held that Mr. Hopkins' statements were taken in violation of his Sixth Amendment rights, however, the statements would be admissible for impeachment purposes. Hr'g Tr. 121, ECF No. 92.

through cross-examination influenced his decision to not testify. Appellant's Reply. Br. 8. The Government's use of this evidence would have directly contradicted Mr. Hopkins' claim that his desire to have intercourse with "Paula" was only part of an unrealistic "fantasy" and that he did not believe she was real. Therefore, attorney Friedman reasonably advised Mr. Hopkins not to take the stand, to shield the jury from hearing Mr. Hopkins' incriminating statements.

Even without the jury hearing Mr. Hopkins' statements to the FBI, the evidence produced at trial—including Mr. Hopkins' chats with Norma and Paula, and the fact that he physically showed up to the airport with lingerie and a stuffed animal—was enough to convince the jury of Mr. Hopkins' intent. Taking the stand would only have harmed his case further and would not have changed the outcome of the trial. The Court finds that Mr. Hopkins' ineffective assistance of counsel claim fails because he waived his right to testify through his silence at trial, attorney Friedman acted reasonably by advising Mr. Hopkins not to testify, and Mr. Hopkins' failure to testify did not prejudice his case.

**B.  Trial Counsel did not gather and present critical evidence.**

Mr. Hopkins alleges multiple instances where trial counsel failed to gather and present evidence that, as Mr. Hopkins puts it, was critical to his defense. Def.'s Amend. Mot. at 8.  The representation of criminal defendants entails "certain basic duties," such as gathering evidence favorable to the client. *Strickland*, 466 U.S. at 488. However, Sixth Amendment claims should not be used to question every strategic decision that a lawyer makes; rather, they are meant to ensure that a lawyer acts reasonably. *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000) ("[W]e have consistently declined to impose mechanical rules on counsel-even when those rules might lead to better representation . . . out of deference to counsel's strategic choices."). As outlined below, attorney Friedman made strategic decisions about how and what evidence to present

based on the theory that Mr. Hopkins never intended to have sex with minors, and instead was engaging in fantasy-based conversations with other adults. Friedman Decl. Ex. A, at 4. Mr. Hopkins fails to plausibly show that his trial attorneys' decisions about which evidence to use was unreasonable or prejudicial to his case.

First, Mr. Hopkins avers that trial counsel failed to obtain and present Facebook chats between Mr. Hopkins and a minor living in Peru that would show that Mr. Hopkins did not have inappropriate conversations with that particular minor. Def.'s Amend. Mot. 8. Although Mr. Hopkins does not make it clear, the Court presumes this would help show a lack of propensity to be inappropriate with minors generally. *Id.* However, the jury heard a stipulation, agreed to by both parties, that Mr. Hopkins did not engage in an inappropriate relationship with a minor in Peru. Trial Tr. vol. 3, 317–18, ECF No. 137. The actual Facebook chats would not have changed the outcome because they did not provide the jury with new information. Moreover, providing the jury with evidence that Mr. Hopkins was not inappropriate with a different minor on another occasion, does nothing to negate the behavior he exhibited in his chats with "Paula," which the jury had full access to. It is certainly not unreasonable for an attorney, defending on these allegations, to downplay the fact that his grown adult client spent time chatting with children over the internet for any reason.

Second, Mr. Hopkins alleges that trial counsel failed to conduct a forensic examination of the CI's computer hard drive. Def.'s Amend. Mot. 8. Mr. Hopkins claims that a forensic examination of the hard drive would show that he did not send illicit photographs to the CI in 2012, when they first began chatting online. *Id.* Even if a forensic examination of the hard drive would prove this, it would not have significantly advanced the defense's theory that his chats were fantasy-based, and that Mr. Hopkins never intended to have sex with a minor. Moreover,

the absence of illicit photos from 2012 would not negate the evidence of his illicit conversations with the CI and the FBI agent later in 2017. *See* Gov't Resp. 18.

Third, Mr. Hopkins alleges attorney Friedman failed to obtain information from Mr. Hopkins' AFF account. Def.'s Amend. Mot. 8. Mr. Hopkins claims this information would have shown that he did not use AFF as a platform to have inappropriate conversations with minors or seek explicit photographs of minors. *Id.* Additionally, Mr. Hopkins claims that the account information would show how the confidential informant entrapped him. *Id.* But the Government never alleged that Mr. Hopkins communicated directly with other minors or obtained elicit photographs of minors through his AFF account. *See* Gov't Resp. 17. Instead, the Government used evidence of conversations on *other* platforms where Mr. Hopkins boasted about having relations with minors to make its case that Mr. Hopkins had a predisposed desire to engage in sex acts with children.[6] *Id.* All of this evidence pointed towards Mr. Hopkins' well documented interest in minors and was used to negate his entrapment defense *Id.* at 9. A showing that Mr. Hopkins only chatted with other adult users on AFF would do very little to belie other sources of evidence revealing Mr. Hopkins' interest in children. *Id.* at 17. Furthermore, Mr. Hopkins does not specify in his Motion what evidence his counsel should have obtained from AFF to show how the CI "predatorily" entrapped him. *See* Def.'s Amend. Mot. 8. In sum, the chat history from AFF was inconsequential to Mr. Hopkins' case, and attorney Friedman did not act unreasonably by choosing to omit such evidence.

---

[6] This evidence included: (1) a 2017 text exchange between Mr. Hopkins and another woman where he described having sex with the woman's 17 and 13-year-old daughters; (2) a 2017 conversation where Mr. Hopkins described masturbating to a picture of a 14-year-old to the recipient; and (3) a 2013 chat conversation where Mr. Hopkins describes a past experience of paying an 11-year-old $100 and a cell phone in exchange for sex and askes the recipient if she can find him underage girls. Gov't Resp. 9

Fourth, Mr. Hopkins alleges that trial counsel failed to secure testimony from female witnesses in Peru, Panama, and Mexico. Def.'s Amend. Mot. 10. But here again, the parties agreed to introduce statements from the witnesses stipulating that Mr. Hopkins did not have sexual relations or inappropriate conversations with certain minors located in those countries. Trial Tr. vol. 3, 316–17. The stipulations protected these witnesses from adverse Government cross-examination, which may have revealed prejudicial information about Mr. Hopkins' relationship with those minors, even if those relationships were not explicitly sexual in nature. Trial counsel made a reasonable and calculated decision to refrain from calling these witnesses, a decision that likely helped, rather than harmed Mr. Hopkins' case. Mr. Hopkins fails to specify what more the witnesses could have said to help his case, beyond what was covered in the stipulation, or how the additional testimony would have changed the weight of the substantial evidence against him.

Fifth, Mr. Hopkins alleges that his attorneys failed to obtain communications between the FBI and U.S. embassies in Peru and Panama. Def.'s Amend. Mot. 9. According to Mr. Hopkins, these communications would have revealed that the Peruvian and Panamanian governments prevented potential witnesses from presenting exculpatory testimony in Mr. Hopkins' trial. *Id.* Mr. Hopkins does not explain how or why the communications would show that the governments of Peru and Panama suppressed potential witness testimony or what new exculpatory evidence the witnesses in Peru and Panama could have provided that was not already included by the stipulations.

Sixth, Mr. Hopkins claims that trial counsel should have employed a Spanish etymologist to clarify the meaning of Spanish words and vernacular used in the chats between Mr. Hopkins and the CI. *Id.* Mr. Hopkins avers that a Spanish etymologist would have aided his defense by

10 – OPINION AND ORDER

translating terms to show that his chats were fantasy-based, and that he never intended to have sex with a minor. *Id.* However, the chats presented at trial were almost entirely in English. Gov't Resp. 17–18. Furthermore, a court interpreter was present at trial and interpreted for the jury when parties used any Spanish words. *See* Trial Tr. vol. 2, 182, ECF No. 136. Because the chats were mostly in English, and a court official interpreted the few Spanish words used in the chats, it was reasonable for counsel not to hire a Spanish etymologist.

Seventh, Mr. Hopkins argues that trial counsel should have employed a statistician to prove that Mr. Hopkins' claims to the CI regarding his sexual history were statistically impossible. Def.'s Amend. Mot. 9. Specifically, Defendant avers "[a] statistician could have shown that it was highly improbable that these conversations were anything but fantasies and that it was highly improbable that the participants would have tracked the same fantasies." Def.'s Amend. Mot. 9. It is unclear to the Court what Mr. Hopkins means by this, or how one procures statistics on the nature of sexually explicit conversations like the ones Mr. Hopkins had with the CI. A review of the trial transcript shows that even without a statistician, trial counsel insinuated that Mr. Hopkins was engaging in fantasy because it would be statistically impossible for a person to have the number of sexual encounters he claimed.[7] *See* Trial Tr. vol. 2, 259; Trial Tr. vol. 3, 418–19. A statistician would not likely have bolstered this argument, and therefore, it was reasonable for counsel not to call this witness.

---

[7] Mr. Hopkins claimed in various online chats that he had sexual encounters with over 700 females. Trial Tr. vol. 2, 259. The Court assumes that Mr. Hopkins is arguing that a statistician would have proven that this claim is statistically impossible. The Court makes no comment on the merit of this claim.

Eighth, Mr. Hopkins claims that trial counsel should have employed a mental health expert to discuss Mr. Hopkins' Post Traumatic Stress Disorder ("PTSD") diagnosis. Def.'s Amend. Mot. 9. Mr. Hopkins believes that an expert witness would have cast doubt on whether he met the required mental state for the alleged crimes, or alternatively, would have resulted in a reduced sentence. *Id*. But Mr. Hopkins fails to explain how his PTSD would have affected his intent to have sex with a minor. The Court is not convinced that a mental health expert would have convinced the jury that Mr. Hopkins did not understand the nature of his calculated actions, nor would it have changed the outcome of his trial.

Ninth, Mr. Hopkins alleges that trial counsel failed to secure character witness testimony from Mr. Hopkins' friend, Clark Hardy, and Mr. Hopkins' brother, Steven Hopkins. Def.'s Amend. Mot. 10. But neither of these individuals were key witnesses to the crimes, and Mr. Hopkins provides no explanation about what character testimony Mr. Hardy or Steven Hopkins would have provided, or how they would have helped the defense strategy.[8] In any event, the parties did agree to a stipulation that included character testimony from Steven Hopkins. Trial Tr. vol. 3, 318–19. Curiously, Steven Hopkins' character testimony did not paint Defendant Hopkins in the best light; he stated that his brother "drinks to excess" and "spends too much time on the Internet." *Id.* Based on the stipulation, Steven Hopkins would probably not have provided testimony at trial that would have significantly helped Mr. Hopkins' case. But even if he did provide favorable testimony, any evidence of Mr. Hopkins' redeeming attributes would have

---

[8] In his Motion, Mr. Hopkins does not even describe what he anticipates that Mr. Hardy and Mr. Hopkins' brother would have said to aid in his defense. Def.'s Amend. Mot. 10.

paled in light of the evidence against Mr. Hopkins and would not have seriously impacted the outcome of the trial.

Finally, Mr. Hopkins claims that trial counsel should have called a Motel 6 employee to testify that when Mr. Hopkins reserved a motel room near Portland, he did not list a minor on the reservation. Def.'s Amend. Mot. 10. But the parties agreed to a stipulation that stated Mr. Hopkins reserved a room at the Motel 6 for three adults. Trial Tr. vol. 4, 580–81, ECF No. 139. The stipulation also included the Motel 6 policy that children stay for free. *Id.* The jury heard the relevant information, and it is unlikely that the outcome would have been different if the jury heard this information directly from a Motel 6 employee. Counsel's decision not to call a Motel 6 employee to the stand was reasonable.

In sum, none of the evidence Mr. Hopkins claims his trial counsel should have presented to the jury would have changed the outcome of the trial. The Court gives wide deference to the strategic decisions of trial counsel and will only find error where the decision, without the benefit of hindsight, was objectively unreasonable and prejudicial to a defendant's case. *Strickland*, 466 U.S. at 687. That was not the case here as the evidence presented by the Government at trial was overwhelming.

### C.  Mr. Hopkins' competency to stand trial.

Mr. Hopkins further claims that his "severely low blood pressure . . . impair[ed] his cognitive abilities," making him incompetent for trial, and that attorneys Boender and Friedman failed to notice or act upon Mr. Hopkins' alleged incompetency.[9] Def.'s Amend. Mot. 11–12. "A

---

[9] In Mr. Hopkins' *pro se* motion, he stated that he felt "impaired" as well as "fuzzy and fatigued" during a "several week episode . . . prior to and during his trial." Def.'s § 2255 Mot. 9. Mr. Hopkins claims that he told attorney Boender that he was "out of it" because of low blood pressure. *Id.*

criminal defendant may not be tried unless he is competent." *Godinez v. Moran*, 509 U.S. 389, 396 (1993). For a court to find a defendant incompetent to stand trial, the defendant must show "that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Drope v. Missouri*, 420 U.S. 162, 171 (1975).

In a sworn declaration, attorney Boender stated that Mr. Hopkins "did not exhibit any lethargy, difficulty seeing, [or] confusion," and he noted that Mr. Hopkins did not "faint" or "report that he felt lightheaded." Boender Decl. Ex. B, at 3, ECF No. 192-2. Attorney Boender worked "daily" with Mr. Hopkins and noted that he "appeared alert and engaged throughout the trial." *Id.* at 2. Attorney Friedman also reported that Mr. Hopkins "was at all times fully engaged in his defense." Friedman Decl. Ex. A, at 5. In Mr. Hopkins' *pro se* § 2255 motion[10] (ECF No. 168), he details how he actively communicated with trial counsel and assisted in preparing his defense. Mr. Hopkins describes how he helped identify potential defense witnesses, including nine witnesses that he "urged" attorney Friedman to put on the stand. Def.'s § 2255 Mot. 16. Mr. Hopkins directed attorney Friedman to investigate the CI and her family. *Id.* at 18–19. During cross-examination, Mr. Hopkins was alert and engaged to a high enough degree that he was able to critique attorney Friedman's performance as well as point out instances of the CI allegedly lying on the stand. *Id.* at 22. Mr. Hopkins' own recollection of events shows that he understood the proceedings and actively participated in his own defense.

---

[10] Mr. Hopkins' First Amended Motion (ECF No. 190) incorporates by reference his *pro se* § 2255 Motion (ECF No. 168).

Even if attorneys Boender and Friedman argued that Mr. Hopkins was incompetent, as Mr. Hopkins suggests they should have, it would have been a meritless endeavor. The facts here show that he would have been found competent to stand trial because he actively consulted with counsel and prepared for his defense. Nothing in the record, or in Mr. Hopkins' Motion, indicates that he was unable to "understand the nature and object of the proceedings against him." *Drope*, 420 U.S. at 171. At no time did the Court observe anything other than a defendant fully engaged with counsel during trial.

### D.  <u>Investigation into misconduct by government witnesses.</u>

Mr. Hopkins further alleges that attorney Friedman failed to investigate potential misconduct by FBI agents and the CI. Def.'s Amend. Mot. 12–13. However, attorney Friedman hired a private investigator to investigate both the CI and the FBI agent involved in the case. Friedman Decl. Ex. A, at 5. Attorney Friedman then used the information from the investigation to impeach both witnesses at trial. *Id.*; *see* Trial Tr. vol. 3, 390, 494. Moreover, the defense procured all other potential impeachment information for government witnesses through discovery. Gov't Resp. 21. Mr. Hopkins fails to show how attorney Friedman acted unreasonably or how the information that Mr. Friedman allegedly failed to investigate would have impacted his case.

### E.  <u>Effectiveness of attorney Friedman's cross-examination.</u>

Mr. Hopkins also claims that attorney Friedman failed to impeach the CI when she allegedly lied twice under oath, which he believes could have undermined the CI's credibility. Def.'s Amend. Mot. 13. However, an attorney's "tactical decisions at trial, such as refraining from . . . asking a particular line of questions, are given great deference and must similarly meet only objectively reasonable standards." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000). A

review of the record reveals that attorney Friedman repeatedly attacked the CI's credibility

throughout cross-examination. [11]  Attorney Friedman highlighted the CI's inconsistent testimony,

propensity to lie, and lapses in memory. *See* Trial Tr. vol. 2, 247, 253, 254, 260. Moreover, in his

declaration, attorney Friedman notes that the CI "had not given prior sworn testimony, and had

refused to be interviewed, so it was not possible to positively contradict her denials of statements

she had made to Mr. Hopkins (according to him)." Friedman Decl. Ex. A, at 5. Attorney

Friedman made an objectively reasonable effort to impeach the CI and this Court is not at liberty

to find fault in Mr. Friedman's performance simply because Mr. Hopkins is unhappy with the

outcome.

      **F.**  **Mitigating evidence at sentencing.**

      Mr. Hopkins alleges that sentencing counsel Thaddeus Betz should have employed a

medical professional to research and present information about Mr. Hopkins' medical conditions

at sentencing. Def.'s Amend. Mot. 15. Mr. Hopkins argues that he could have received a shorter

sentence if attorney Betz had obtained jail medical records and mentioned Mr. Hopkins' PTSD

and blood pressure issues at sentencing. *Id.*

      Contrary to Mr. Hopkins' allegation, attorney Betz claims that he requested and received

Mr. Hopkins' jail medical records, and indeed, before sentencing, the Court received a

presentence report ("PSR") that included information about Mr. Hopkins' medical history,

---

[11] To establish that the FBI entrapped Mr. Hopkins, Mr. Friedman emphasized the ways that the
CI allegedly initiated inappropriate conversations about minors with Mr. Hopkins. *See* Trial Tr.
vol. 2, 283–84. Attorney Friedman intentionally cross-examined the CI to advance the defense's
theory that Mr. Hopkins was engaging in fantasy-based conversation and did not intend on
having sex with a minor. *See id.* at 259–61. Attorney Friedman also impeached the CI on the
grounds that she had no experience or training as a confidential informant. *See id.* at 253–54.
Finally, attorney Friedman tried to control the CI by telling her to "keep your answers shorter"
during cross-examination. *See id.* at 296.

including his PTSD and blood pressure issues. Betz Decl. Ex. C, at 2, ECF No. 192-3; PSR 2,

ECF No. 142. At the sentencing hearing, Mr. Hopkins confirmed that he had reviewed the PSR,

and he did not mention that any information was absent. Sentencing Tr. 3–4, ECF No. 161. Mr.

Hopkins also confirmed that he was "satisfied with [attorney Betz's] advice and representation."

*Id.* at 4. The Court reviewed the presentence report and discussed its contents at the sentencing

hearing. *Id.* at 4–5. Although the Court did not specifically mention Mr. Hopkins' PTSD and

blood pressure issues at the hearing, a judge need not list every factor that went into a sentencing

decision. *See Rita v. United States*, 551 U.S. 338, 358–59 (2007).

Attorney Betz effectively represented Mr. Hopkins at sentencing by providing relevant

medical information and highlighting several mitigating factors for the Court to consider.[12] Mr.

Hopkins fails to show how a medical professional would have uncovered health issues not

already reported to the Court; it is unlikely that the same information presented by a different

party would change the sentence imposed in this case.

### G.  Cumulative Impact

Finally, Mr. Hopkins argues that the cumulative impact of his attorneys' alleged errors

warrants relief, even if the individual allegations alone would not suffice. Def.'s Amend. Mot.

15. A court should consider the cumulative impact of an attorney's alleged errors when

considering whether the representation was prejudicial to the defendant's case. *Turner v.

Duncan*, 158 F.3d 449, 457 (9th Cir. 1998). In *Turner*, the court found that defendant's trial

---

[12] Attorney Betz mentioned Mr. Hopkins' ongoing fight with cancer, alluded to other health issues, highlighted his military service and past career, spoke on his volunteer work, and pointed out his age. *See* Sentencing Tr. 12.

17 – OPINION AND ORDER

counsel was inadequate by neglecting to take "basic steps" to prepare for trial, including failing to use exculpatory evidence and failing to read the defendant's case file. *Id.* at 456.

Unlike the trial counsel in *Turner*, Mr. Hopkins' attorneys properly prepared for trial by employing a private investigator to investigate witnesses, making and responding to motions in limine, agreeing to stipulations, and seeking to suppress prejudicial evidence. During trial, Mr. Hopkins' attorneys made reasonable tactical decisions such as impeaching government witnesses on cross-examination and making appropriate objections. Mr. Hopkins was fully informed and involved at every stage of his defense and he appears to have accepted his attorneys' advice to not testify. Although Mr. Hopkins may now disagree with his trial attorneys' advice and strategy, "fundamental unfairness would characterize a process that lets defendants have one trial based on their lawyer's strategy and another trial based on their own." *United States v. Martinez*, 883 F.2d 750, 761 (9th Cir. 1989) (vacated on other grounds).

## CONCLUSION

Mr. Hopkins' Motion to vacate or set aside his sentence under 28 U.S.C. § 2255 is DENIED. Because Mr. Hopkins has not made a substantial showing of the denial of a constitutional right, a certificate of appealability is denied. *See* 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this 16th day of February, 2023.


 /s/ Michael J. McShane
MICHAEL J. MCSHANE
U.S. District Judge